**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————

|  |  |
|---|---|
| TI INVESTMENT SERVICES, LLC, and WORLD PHONE INTERNET SERVICES, PVT. LTD, | : : : : : |
| Plaintiffs, | : : |
| v. | : Civil Action No. 13-4823 (FLW)(TJB) : : |
| MICROSOFT CORPORATION, | **OPINION** : : |
| Defendant. | : : |

—————————————————————

**WOLFSON, United States District Judge:**

Before the Court is the Motion of Microsoft Corporation ("Defendant") to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), the Complaint of TI Investment Services, LLC ("TI"), and World Phone Internet Services, Pvt. Ltd. ("World Phone"), (collectively "Plaintiffs"), which includes claims for violations of the Sherman Antitrust Act and the New Jersey Antitrust Act, along with claims under the New Jersey common law for unfair competition and tortious interference with prospective economic relations.

For the reasons that follow, this Court finds i) that Plaintiff TI Investment Services lacks standing to bring suit in this case; ii) that Plaintiff World Phone has inadequately alleged an antitrust injury and lacks standing to sue under the Sherman Act; iii) that the FTAIA exempts certain of the Defendant's conduct from the applicability of the Sherman Act; iv) that Plaintiff World Phone has inadequately alleged the relevant market for its antitrust claims; v) that Plaintiff

1

World Phone has inadequately alleged the elements of a Sherman Act conspiracy; and vi) in the absence of federal claims the Court declines to exercise its supplemental jurisdiction over claims brought under New Jersey state law. Accordingly, the Complaint is dismissed.

I. BACKGROUND

The federal antitrust claims in this case all concern the alleged attempt to monopolize the market for Voice-over Internet Protocol ("VoIP") services for calls made between the United States and India. VoIP service providers enable users to make "telephone" calls to one another over the internet. These calls can be made directly from one computer or internet connected device to another computer or internet connected device, or can connect to the traditional telephone network. Calls of the former variety are often provided by VoIP service providers free of charge; this leaves providers heavily dependent for revenue upon the latter category of calls, those connecting computers or internet devices to telephones on the public switched telephone networks ("PSTN"). The basic mechanism by which the VoIP service providers make money is simple. When a VoIP service subscriber makes a call using a computer or internet connected device to a traditional telephone on the PSTN, the VoIP service provider charges a flat or per minute fee to connect the call over the internet. A similar fee is charged when a VoIP service subscriber receives a call originating from a traditional telephone on the PSTN.

The government of India regulates VoIP services through the Ministry of Communications and Information Technology, Department of Telecommunications ("Ministry of Communications"). Pursuant to a 2002 Indian law, companies seeking to provide VoIP services in India must be licensed by the Ministry of Communications. These licenses, among

other conditions, require that VoIP service providers 1) provide semiannual reports to the government on the quality of services provided to their subscribers; 2) provide services to rural users on a non-discriminatory basis; 3) pay the Indian government an annual licensing fee of 6% of their adjusted gross revenue; and 4) locate in or relocate to India all necessary infrastructure for the processing, routing, directing, managing, or authenticating of their VoIP calls. This final requirement was to be complied with no later than January 1, 2008.[1]

Plaintiff World Phone is a provider of VoIP services in India.[2] Defendant Microsoft is also a provider of VoIP services, including in the Indian market, having gained worldwide VoIP capability with its acquisition of Skype in 2011. Both companies provide services including the connecting of calls over the internet from India to the United States and from the United States to India. Plaintiff World Phone is a licensed Indian VoIP service provider and is alleged to have fully complied with the requirements of the Ministry of Communications' licensing regime. This compliance includes the costly 2008 relocation of all of Plaintiff's VoIP infrastructure — primarily server banks — from New Jersey to India. By contrast, Plaintiffs allege that Defendant and other multi-national companies have not obtained a license from the Ministry of Communications and have not complied with the mandates of the licensing regime. Defendant allegedly does not file semiannual reports, does not pay annual licensing fees, and has not

---

[1] Here, the Court only recounts what Plaintiffs have alleged Indian law to be. The Indian regulatory statutes, while asserted in the Complaint to underlie the "Licensing Agreement" imposing obligations on VoIP companies, have not been provided to the Court in their original form. The Court declines to take judicial notice of the foreign laws without evidence of their actual text or other support. Chicago Pneumatic Tool Co. v. Ziegler, 151 F.2d 784, 793 (3d Cir. 1945) ("The state of foreign law or the effect or operation of foreign law is a matter of fact and requires proof."). See also Fed. R. Civ. P. 44.1.

[2] Plaintiff TI Investment Services is a limited liability company and special purpose vehicle formed in the United States to fund World Phone and is now World Phone's majority shareholder.

relocated any of its VoIP infrastructure from the United States to India. The specific violations of the other noncompliant companies are not enumerated in the Complaint.

Plaintiffs allege that Defendant's noncompliance is intentional. Many of the requirements of the Indian licensing regime impose costs upon VoIP service providers — either in the form of direct taxes or indirect increased operating expenses. By allegedly avoiding the costs associated with licensing, in violation of Indian law, Defendant is able to offer its VoIP services at a lower price than Plaintiff World Phone and other Indian-law-compliant providers. Plaintiffs allege that Defendant is utilizing this unlawful price advantage to win customers that would otherwise have used Plaintiff World Phone's services, with the aim of eventually driving Plaintiff World Phone and other compliant companies out of the VoIP services industry, thereby monopolizing the market of VoIP calls between the United States and India.[3]

## II. PROCEDURAL HISTORY

Plaintiffs filed the Complaint in the instant matter on August 12, 2013. In Count I of the Complaint, Plaintiffs allege that Defendant engaged in a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and an attempt to monopolize trade or commerce with a foreign nation in violation of Section 2 of the Sherman Act.[4] Counts II, III, and IV of the

---

[3] As explained, _infra_, while categorizing their filing as a monopolization claim, Plaintiffs actually admit that even if all compliant companies were driven from the market, other noncompliant competitors to Microsoft would remain in the Indian VoIP market. [Complaint, ¶ 49].

[4] Sherman Act, 15 U.S.C. § 2. Section 2 sanctions those "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations." "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business

Complaint allege state law causes of action. On October 11, 2013, Defendant moved to dismiss the complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Specifically, Defendant contends that Plaintiffs fail to state a claim for relief under the Sherman Act because (i) the Complaint does not adequately allege antitrust injury, (ii) the FTAIA exempts Defendant's conduct from the scope of the Sherman Act, (iii) Plaintiffs have failed to allege all necessary elements of a monopolization claim under the Act, and (iv) Plaintiffs have failed to allege all necessary elements of a conspiracy claim under the Act. Defendant also moves to dismiss all claims brought by Plaintiff TI Investment Services for lack of standing, and to dismiss all state law claims.

## III. STANDARD OF REVIEW

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 149–50

---

acumen, or historic accident." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 n. 19 (1985) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)). See also Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 749 (3d Cir. 1996) (same).

n. 3 (1984) (quotation and citation omitted). A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" Bell Atlantic v. Twombly, 550 U.S. 544, 583 (2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009) ("Our decision in Twombly expounded the pleading standard for all civil actions.") (internal citations omitted); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before Twombly.").

Following the Twombly/Iqbal standard, the Third Circuit applies a two-part analysis in reviewing a complaint under Rule 12(b)(6). First, a district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Fowler, 578 F.3d at 210. Second, a district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." Ibid. A complaint must do more than allege the plaintiff's entitlement to relief. Ibid.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (stating that the "Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."). A court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429–30 (3d Cir. 1997). The defendant bears the burden of showing that no claim has been presented. Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr Packages, Inc. v.

Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)). Finally, a court in reviewing a Rule 12(b)(6)

motion must only consider the facts alleged in the pleadings, the documents attached thereto as

exhibits, and matters of judicial notice. Southern Cross Overseas Agencies, Inc. v. Kwong

Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999).


IV. JURISDICTION: 28 U.S.C. § 1331


A district court may exercise original jurisdiction over "Cases, in Law and Equity, arising

under this Constitution, the Laws of the United States, and Treaties made, or which shall be

made, under their authority." U.S. Const. art. III., § 2; see also 28 U.S.C. § 1331. In the

Complaint, Plaintiff alleges, inter alia, violation of the Sherman Act, 15 U.S.C. §§ 1 and 2. The

Court, accordingly, has original jurisdiction over this matter as arising under the laws of the

United States.[5]

---

[5] Plaintiffs also allege that this Court has diversity jurisdiction, but fail to adequately plead the citizenship of the parties to establish diversity. Partnerships and other unincorporated associations, including LLCs, are "not considered 'citizens' as that term is used in the diversity statute." Swiger v. Allegheny Energy, Inc., 540 F.3d 179 (3d Cir. 2008) (citing Carden v. Arkoma Assocs., 494 U.S. 185, 187-92 (1990)). Instead, "the citizenship of a limited liability company 'is determined by the citizenship of each of its members.'" Johnson v. SmithKline Beecham Corp., 724 F.3d 337, 348 (3d Cir. 2013) (quoting Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 418 (3d Cir. 2010)). Accordingly, in the context of LLCs "the complete diversity requirement demands that all [members of the LLC] be diverse from all parties on the opposing side." Swiger, 540 F.3d at 183. The citizenship of Plaintiff TI Investment Services, LLC has not been properly alleged for diversity purposes — the domiciles of its members have not been identified. However, as the court has independent, original jurisdiction over the subject matter because of the question of federal law presented in this case, the deficiency of Plaintiffs' citizenship allegations is not dispositive.

V. STANDING

A. Plaintiff TI Investment Services, LLC

Defendant challenges the standing of Plaintiff TI Investment Services to sue under the Sherman Act. Specifically, Defendant contends that TI has not suffered an antitrust injury independent of that suffered by World Phone, and can claim injury in this case, if at all, only as the majority shareholder of World Phone. Because shareholders do not have standing to bring suit arising from injuries suffered purely by the corporations they own, Defendant argues TI lacks standing in this case. The Court agrees.

It is well established in this Circuit that the Sherman Act, as amended by the Clayton Act, does not create a cause of action for "indirect harm that the individual may have suffered as a stockholder through injury inflicted upon the corporation." Pitchford v. PEPI, Inc., 531 F.2d 92, 97 (3d Cir. 1975). While the matter of the presence of antitrust injury in this case is disputed, the only antitrust injuries alleged, whether legally sufficient under the Act or not, have been suffered by World Phone. World Phone is the market participant alleged to have lost market share and revenue as a result of Defendant's alleged unlawful attempt to monopolize the market for VoIP services connecting India and the United States; and World Phone is the competitor who may be squeezed out of the VoIP market, thereby enabling Microsoft to exercise monopoly power and extract monopoly rates at some point in the future. While TI owns 90% of World Phone, its involvement in World Phone's business is as a stockholder and special purpose vehicle to permit

World Phone to access US capital markets.[6] [Complaint, ¶ 17]. Here, as in <u>Pitchford</u>, therefore, "[t]here is no proof that any of the restraints were directed against [shareholder plaintiff] individually as a shareholder or as an officer of [corporate plaintiff]. Consequently, any harm to [shareholder plaintiff] would have to flow derivatively from injuries done the companies of which [it] was a shareholder." <u>Id.</u> In short, the facts alleged in the Complaint fit TI squarely within the definition of a shareholder for standing purposes and outside the category of parties able to bring claims under the Sherman Act. <u>See also ibid</u>. ("Certainly it is not apparent that the Sherman Act was intended to or did confer upon hundreds of thousands of stockholders individual rights of action when the wrongs could have been equally well and more economically be redressed by a single unit in the name of the corporation.").

Antitrust standing usually "is limited to consumers and competitors in the restrained market and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends." <u>W. Penn Allegheny Health Sys., Inc. v. UPMC</u>, 627 F.3d 85, 102 (3d Cir. 2010). Tacitly acknowledging this limitation, Plaintiffs ask the Court to apply the "inextricably intertwined" exception to this rule. The Third Circuit first recognized such an exception in <u>Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.</u>, 995 F.2d 425, 429 (3d Cir. 1993) (stating that antitrust injury occurs if "there exists a 'significant causal connection' such that the harm to the plaintiff can be said to be 'inextricably intertwined' with the antitrust conspiracy."). Since <u>Gulfstream</u>, however, the Third Circuit has "not extended the ''inextricably intertwined' exception beyond cases in which both plaintiffs and defendants are in the business of selling

---

[6] Plaintiffs also allege that TI provides management consulting services to World Phone and, prior to 2008, provided server-related services to World Phone. As explained in more detail, <u>infra</u>, the former contention is not relevant to antitrust standing because it confirms TI's role as a firm doing business (management consulting) that is not in the market in which injury is alleged to have occured (VoIP services). The latter contention only addresses involvement from TI prior to 2008 — a period before the alleged injuries were suffered.

goods or services in the same relevant market,' though they may not directly compete against each other." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 237 (3d Cir. 2013) (quoting Broadcom Corp. v. Qualcomm, Inc., 501 F.3d 297, 320–21 (3d Cir. 2007)) (emphasis in original). It appears that under current law, the inextricably intertwined "exception" has been reduced to a restatement of the antitrust injury requirement. See Ethypharm, 707 F.3d at 235 (limiting antitrust standing to sue defendants to plaintiff companies that "could and did offer the exact same service to consumers"). Accordingly, although TI's business operations may be enmeshed in World Phone's own operations — in the form of consulting arrangements and support services — its alleged antitrust injury is not. [Complaint, ¶ 6 ("Plaintiff TI Investment is the majority owner of Plaintiff World Phone and has provided telecommunications consulting services to World Phone since World Phone's formation."); ¶ 26 (prior to 2008 "World Phone's servers were located in New Jersey and configured and supported by TI Investment")]. TI is not itself in the business of providing VoIP services in the India-US market. In fact, it is not alleged to provide VoIP services in any market. Instead, it operates as an active special purpose vehicle, owning a controlling stake in, and providing support services to, the actual market participant, World Phone. Ibid. TI Investment Services lacks standing to sue under the Sherman Act and is dismissed as a Plaintiff in this case.


B. Plaintiff World Phone


     Although not characterized in Defendant's Motion as a challenge to standing, Defendant also contends that Plaintiff World Phone has failed to allege antitrust injury. Because antitrust injury is a necessary component of antitrust standing, however, the Court construes Defendant's

challenge to the sufficiency of Plaintiff's allegation of antitrust injury as a challenge to Plaintiff World Phone's standing to sue under the Sherman Act.[7] Generally, antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., 429 U.S. 477, 489 (1977).[8] Such injury "is limited to consumers and competitors in the restrained market and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends." W. Penn, 627 F.3d at 102.

Plaintiff World Phone's alleged antitrust injury rests upon three factual assertions concerning Defendant's conduct. First, Plaintiffs assert that Defendant has intentionally failed to comply with India's licensing regime for VoIP service providers. Second, Plaintiffs allege that

---

[7] The Supreme Court established the factors to be considered in evaluating standing in the antitrust context in Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519 (1983). The Third Circuit has interpreted these factors as a multifactor balancing test:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 232-33 (3d Cir. 2013) (quoting In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1165–66 (3d Cir. 1993)). The second factor, antitrust injury, "is a necessary but insufficient condition of antitrust standing." Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 182 (3d Cir. 1997). If it is lacking, a court need not address the remaining Associated General factors. Ethypharm, 707 F.3d at 233.

[8] Brunswick indeed sets bounds as to what qualifies as antitrust injury. For plaintiffs to prevail on a Sherman Act claim,

> they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

429 U.S. at 489 (quoting Zenith Radio Corp. v. Hazeltine Research, 395 U.S., at 125).

Defendant enjoys lower operating costs by not complying with India's licensing regime for VoIP service providers. Third and finally, Plaintiffs allege that Defendant has intentionally used the cost advantage gained from noncompliance to charge "artificially" lower prices than Plaintiff World Phone, with the intent of driving World Phone and other Indian-law-compliant companies out of the relevant VoIP market. See Complaint, ¶ 60 ("Defendant Microsoft . . . rigged the deck by declining to comply with Indian . . . law. In so doing, it was able to sell its services for the below valid cost structure referenced above . . . . [I]t is this exact anti-competitive behavior which inflicted a direct injury on Plaintiffs and reduced competition from Plaintiffs as well as other Indian Compliant Companies. Moreover, it was this conduct which rendered valueless the $3 million spent by Plaintiffs on advertising and marketing."). As a result of Defendant's conduct, Plaintiffs claim two categories of "antitrust injury." Plaintiffs claim that the $3 million spent to advertise World Phone's services in India was rendered useless by Defendant's lower prices. [Complaint, ¶ 29]. Plaintiffs also claim that World Phone's VoIP business suffered a decline in market share and revenue during the period roughly between 2008 and 2012, as a result of consumers switching to Defendant and other noncompliant companies able to provide VoIP services at lower cost. [Complaint, ¶ 31].[9]

---

[9] As a threshold matter, Defendant argues that World Phone's alleged injuries are not of the type the antitrust laws were intended to prevent. [Defendant's Brief in Support, I(A), p. 4-5 (citing Brunswick)]. Specifically, Defendant argues that, according to the Complaint, Defendant's alleged anticompetitive conduct of failing to comply with Indian regulatory statutes has actually lowered prices in the market for VoIP services between the United States and India. Accordingly, consumers have benefitted from the violation as alleged, and the US-India market for VoIP services enjoys more price competition, not less. Defendant cites Brunswick in support of this argument. [Defendant's Brief in Support, I(A), p. 4]. The Court finds that Defendant is only partially right: while competitors who have lost revenue as a result of increased price competition are normally unable to allege an antitrust injury, there are limited circumstances in which such a competitor may nevertheless have a cause of action under the Sherman Act.

The short-term effect of certain anticompetitive behavior[,] predatory below-cost pricing . . . for example[,] may be to stimulate price competition. But competitors may be able to

While Plaintiffs go to great lengths to establish that this claim of antitrust injury does not depend entirely upon a predatory pricing claim,[10] it is clear that pricing is the alleged anticompetitive conduct of Defendant giving rise to Plaintiffs' alleged injury. [Complaint, ¶ 60]. The Third Circuit has observed that the United States Supreme Court consistently treats monopolization claims as based upon predatory pricing "regardless of the way in which the plaintiff cast its grievance, because pricing itself operated as the exclusionary tool." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 275 (3d Cir. 2012) cert. denied, 133 S. Ct. 2025, 185 L. Ed. 2d 886 (U.S. 2013). In an exercise in overly clever draftsmanship, Plaintiffs have attempted to structure the Complaint to cast Defendant's noncompliance with Indian law as the anticompetitive conduct giving rise to Plaintiff's injuries. The simple fact of the injuries actually alleged, however, reveals that the only economic mechanism by which Plaintiff World Phone is alleged to have suffered injury in the market for VoIP services is the pricing of its competitor Microsoft's services. According to Plaintiffs, consumers chose to purchase the VoIP services of Defendant over those of Plaintiff World Phone because Defendant charged a lower price.

---

prove antitrust injury before they actually are driven from the market and competition is thereby lessened.

Brunswick Corp., 429 U.S. at 489 n. 14. This language in Brunswick is consistent with the structure of the Sherman Act itself. It gives effect to the plain terms of Section 2 of the Sherman Act, which provides a cause of action both for monopolization, and attempted monopolization. See 15 U.S.C. § 2 (making it illegal for any person to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations"). Thus Brunswick does not stand for the proposition that antitrust injury can never be alleged when consumers in the relevant market experience lower costs. Instead, it leaves open the possibility that Plaintiff may plead a cause of action for antitrust injury arising from Defendant's in-progress attempt to monopolize the relevant market through predatory pricing, rather than waiting until Defendant has already succeeded in monopolizing the relevant market.

[10] See Complaint, ¶ 48 ("In other words, this case is not merely about cutting prices – it is also about Defendant Microsoft unlawfully disregarding a regulatory scheme meant to protect consumers within the Relevant Market.").

[Complaint, ¶ 31]. Thus, this Court considers the antitrust injury alleged in the Complaint as arising from a predatory pricing claim, and applies the legal standard reserved for such claims.

In a fairly recent decision, the Supreme Court outlined the contours of a well-pleaded predatory pricing claim for antitrust injury:

> In a typical predatory-pricing scheme, the predator reduces the sale price of its product (its output) to below cost, hoping to drive competitors out of business. Then, with competition vanquished, the predator raises output prices to a supracompetitive level. See Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 584-585, n. 8 (1986) (describing predatory pricing). For the scheme to make economic sense, the losses suffered from pricing goods below cost must be recouped (with interest) during the supracompetitive-pricing stage of the scheme. *Id.,* at 588-589; Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 121-122, n. 17 (1986); see also R. Bork, The Antitrust Paradox 145 (1978). Recognizing this economic reality, we established two prerequisites to recovery on claims of predatory pricing. "First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993). Second, a plaintiff must demonstrate that "the competitor had ... a dangerous probabilit[y] of recouping its investment in below-cost prices." Id., at 224.

Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 318-19 (2007).

The first prong of the predatory pricing test — requiring that prices be below cost — is necessary because "[a]s a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control." Id. at 223. The United States courts are particularly wary of allowing recovery for above-cost price cutting because allowing such claims could, perversely, "chil[l] legitimate price cutting," which directly benefits consumers. See id. at 223-224; See also Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition."). Thus, the Supreme Court has specifically declined to allow plaintiffs to recover for above-cost price

cutting, concluding that "discouraging a price cut and . . . depriving consumers of the benefits of lower prices . . . does not constitute sound antitrust policy." Brooke Group, supra, at 224. See generally Weyerhaeuser, 549 U.S. at 319.[11]

The second prong of the predatory pricing test — requiring that there be a dangerous probability of recoupment of losses — is necessary because, without a dangerous probability of recoupment, it is highly unlikely that a firm would engage in predatory pricing. As the Court explained in Matsushita, a firm engaged in a predatory pricing scheme makes an investment — the losses suffered plus the profits that would have been realized absent the scheme — at the initial, below-cost-selling phase. 475 U.S. at 588-589. For that investment to be rational, a firm must reasonably expect to recoup in the long run at least its original investment with supracompetitive profits. Ibid.; Brooke Group, 509 U.S. at 224. Without such a reasonable expectation, a rational firm would not willingly suffer definite, short-run losses. Recognizing the centrality of recoupment to a predatory pricing scheme, the Supreme Court requires predatory-pricing plaintiffs to "demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it." Id. at 225. See generally Weyerhaeuser, 549 U.S. at 319-20.

The Supreme Court has described the two parts of the predatory pricing test as "essential components of real market injury" that are "not easy to establish." Id., at 226. The Court, therefore, has instructed the federal courts to scrutinize predatory pricing claims carefully,

---

[11] "The lesson of the predatory pricing case law is that, generally, above-cost prices are not anticompetitive, and although there may be rare cases where above-cost prices are anticompetitive in the long run, it is beyond the practical ability of courts to identify those rare cases without creating an impermissibly high risk of deterring legitimate procompetitive behavior (i.e., price-cutting)." ZF Meritor, 696 F.3d at 274-75 (internal citations omitted).

particularly in the case where the alleged monopolization is only attempted and not complete, because "the costs of erroneous findings of predatory-pricing liability are quite high. . . . 'The mechanism by which a firm engages in predatory pricing-lowering prices-is the same mechanism by which a firm stimulates competition,'" and, therefore, mistaken findings of liability would """"chill the very conduct the antitrust laws are designed to protect."""" Ibid. (quoting Cargill, 479 U.S. at 122, n. 17). See discussion in Weyerhaeuser, 549 U.S. at 320. Bearing in mind the Supreme Court's admonitions, this Court considers both prongs of the predatory pricing test and finds that the allegations in the Complaint set forth neither.

1. Plaintiffs Must Allege Pricing Below Appropriate Measure of Cost

Considering the first prong, Plaintiffs have not alleged that Defendant Microsoft is pricing its VoIP services in the relevant market below cost. In fact, in the place where the Complaint most directly addresses the issue, Plaintiffs admit that Defendant's allegedly anticompetitive prices, "may or may not" be below its experienced costs. [Complaint, ¶ 53 ("Accordingly, although its VoIP pricing for the Relevant Market may or may not be above its current dollar measure of cost, there are additional "losses suffered" by Defendant Microsoft that render its cost structure higher.")]. Plaintiffs try to get around this obvious barrier to pleading antitrust injury, by contending that while experienced cost "may or may not" be higher than Defendant's price, the "fair measure" of Defendant's cost would be increased were Defendant to comply with Indian regulatory laws. [Complaint, ¶ 54 ("Defendant Microsoft's 'measure of cost' has been artificially kept low due to its failure to comply with applicable law."); ¶ 55 ("If Defendant Microsoft actually complied with applicable law, its cost basis would be much higher

16

and the predatory impact would be readily apparent. . . . Defendant Microsoft has suffered ongoing intangible losses based on the reputational risk it was accepting by ignoring applicable regulatory law.")]. These assertions concern the "appropriate measure" of Defendant's costs, but do not take the next step of alleging that the price set by Defendant is below this measure.

As discussed, supra, the foundational assumption of Plaintiffs' three-part argument concerning Defendant's conduct is that a violation of Indian regulatory laws has occurred. In support of this conclusion, Plaintiffs offer citations to a licensing agreement based upon Indian regulatory law [Complaint, ¶¶ 22-25], the opinion of their auditors [Complaint, ¶¶ 30-31 ("In 2011 and 2012, World Phone and TI Investment engaged auditors to assist in determining the cause of World Phone's decline in its Internet Telephony revenues. . . . It was ultimately determined that World Phone was losing prospective and existing customers as a result of unlawful conduct. Specifically, Defendant Microsoft and others were – and to this day still are not – complying with the civil and criminal laws promulgated in India to regulate Internet Telephony service providers.")], and the opinion of an advocate practicing in the Indian Supreme Court [Complaint, ¶ 35 ("Plaintiffs retained [as] counsel an Advocate of the Supreme Court of India who has confirmed that Defendant Microsoft doing business without the prescribed license would be doing business illegally and subject to prosecution for civil and criminal violations by the Government of India.")]. Even viewing these allegations in the light most favorable to Plaintiffs, the Court questions their sufficiency.[12] Plaintiffs have neither provided the text of the

---

[12] To the extent that Plaintiffs' allegations of a violation of Indian regulatory law are not supported by other factual assertions, they are mere conclusions of law, not binding upon the Court at the motion to dismiss stage. See Gage v. Wells Fargo Bank, N.A., AS, 13-3297, 2014 WL 169654 (3d Cir. Jan. 16, 2014) ("'[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.' Therefore, 'a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they

statutes or regulations alleged to be violated, nor provided the Court with the text of Plaintiffs' "expert" opinions. Considerable uncertainty remains as to whether Plaintiffs have alleged a violation of Indian law, but the Court does not base its holding on this uncertainty for the reasons explained below.

Even assuming arguendo that a violation of Indian law has occurred, the allegations in the Complaint are still insufficient to allege pricing below the appropriate measure of Defendant's costs. Never once in the Complaint do Plaintiffs assert that were Defendant Microsoft forced to comply with all applicable Indian licensing regulations its upward adjusted costs would exceed the price it is now charging in the relevant market. Instead, Plaintiffs claim that Defendant's costs would "increase" or be "higher." [Complaint, ¶ 55]. These relative terms are woefully inadequate to state a predatory pricing claim. For example, there are no factual allegations in the Complaint about Microsoft's current price structure and profit margin in the VoIP business. It is possible that Microsoft's current price, while lower than Plaintiffs', is far in excess of Microsoft's actual costs — perhaps due to economies of scale or superior technology. In this hypothetical, it is possible that Microsoft's profit margin is sufficient that, even were the additional costs of regulatory compliance added to its existing cost base, Microsoft would still be selling its services at a price above its upward adjusted cost. The fact of the matter is that, from the Complaint's allegations, the Court cannot draw a conclusion of predatory pricing. In short, Plaintiffs' claim that Defendant's costs would be higher were Defendant brought into compliance with Indian regulations is not equivalent to a claim that Defendant's compliant cost would

---

are no more than conclusions, are not entitled to the assumption of truth.'") (quoting Iqbal, 556 U.S. at 679).

exceed its noncompliant price. For a predatory pricing claim to proceed, Plaintiffs must allege

the latter. Having failed to do so, their Sherman Act claims must be dismissed.

Having found that Plaintiffs have not alleged that Defendant has priced its VoIP services

below cost, I also note that considerations of comity may also counsel against crediting

Plaintiffs' assertions concerning violations of Indian law. The facts as alleged in the Complaint

indicate that if a violation of Indian regulations has occurred the Indian government has not

chosen to act. While it is clear that the Indian Government is aware of Defendant's conduct, it

has taken no action against Defendant even after issuing a warning. [Complaint, ¶ 32 ("Upon

information and belief, the Government of India requested in September 2010 that Skype set up

its VoIP infrastructure in India in order to comply with the local law. . . . Upon information and

belief, despite having ten offices in India, Defendant Microsoft does not currently have any NOC

infrastructure located in India dedicated to the provision of Indian VoIP services. Moreover,

Defendant Microsoft is not listed as a licensed VoIP operator by the Government of India.")].

This contrasts starkly with an example given in the Complaint of quite drastic action undertaken

by Indian authorities when they detect a violation of their laws. [Complaint, ¶ 55 ("Indian

authorities can seek enforcement as against multi-nationals. For example, . . . in early 2013,

Indian tax authorities raided Nokia Corp.'s phone-manufacturing facility and ordered its local

unit to pay 20.8 billion rupees allegedly due in unpaid taxes and fees.")]. The Court sees no

reason why it should decide that Indian laws have been violated when more knowledgeable

Indian authorities have not taken it upon themselves to do so. Without the foundational

assumptions that Defendant Microsoft has violated Indian law and that India seeks to enforce

said law, the entire edifice of Plaintiffs' predatory pricing argument comes crashing down.

Without the violation of Indian law, Plaintiffs propose no impermissible reason for Microsoft's

seemingly lower cost structure, and without some factual allegation to cast doubt upon Microsoft's cost structure, there is no possible claim that Microsoft is selling VoIP services in the relevant market below cost.

2. Plaintiffs Must Allege A Dangerous Probability of Recoupment

The second prong of the predatory pricing test provides an independent basis for dismissal. For a predatory pricing claim to proceed, Plaintiffs must plead that there is a dangerous probability that Defendant will recoup its alleged losses currently being incurred in the relevant market through later exaction of monopoly prices after competitors have been driven out of business. Plaintiffs recite the "magic words" concerning recoupment, [Complaint, ¶ 57 ("Defendant Microsoft's goal has been to remove from competition all Indian Compliant Companies . . . . Only after it has neutered the lawful competition would Defendant Microsoft be situated to recoup the lost profits sustained."); ¶ 58 (explaining that Defendant may have already taken steps to finish monopolizing the market by differentiating from other noncompliant companies, "Microsoft will not only obtain future increased revenues by virtue of its unlawful conduct, it will be closer to realizing its goal"); ¶ 59 ("Microsoft has had and continues to have reasonable expectation of recovering, in the form of future monopoly profits, more than the losses outlined above.")]; but also allege specific facts contradicting these conclusory allegations.

First, Plaintiffs indicate that even if Defendant utilized its alleged illegal price advantage to undercut Indian-law-compliant companies to the point that they were driven out of the market, there are other major competitors, who, like Defendant, are also noncompliant, and would persist

in the market after the compliant companies had ceased to do business. [Complaint, ¶ 49 ("the other publicly-traded VoIP competitors in the Relevant Market who have tacitly joined Defendant Microsoft in disregarding Indian regulatory law . . . [are] Google, Inc., Vonage Holdings Corp., and magicJack VocalTec, Ltd.")]. Moreover, despite Plaintiffs' allegations of these other noncompliant companies' conspiracy with Microsoft and that these companies engaged in the same anticompetitive pricing, the Complaint does not name any of these other companies as defendants.[13] Second, Plaintiffs suggest that Defendant may already be beginning to attempt to recoup its "losses" from alleged predatory pricing by raising rates, but it is clear from the other allegations in the Complaint that Defendant is not yet a monopolist in the relevant market. [Complaint, ¶ 58 ("Less than a year after its acquisition of Skype, Defendant Microsoft decided to discontinue the Unlimited India subscription and began charging consumers on a much more profitable "per minute" basis.")]. It cannot be that Defendant is both forcing competitors from the market by driving its prices below cost <u>and</u> extracting monopoly profits by raising its prices above the market rate. In short, Plaintiffs have alleged that Defendant's conduct will result in other firms — including Google and other multinationals — remaining in the market even after the completion of the alleged predatory pricing "scheme," but have not plausibly alleged that Microsoft could raise prices with these firms still in the market. Accordingly, Plaintiffs have failed to allege a threat of recoupment.

In summary, Plaintiffs assert Section 1 and Section 2 Sherman Act claims in which the only anticompetitive mechanism giving rise to Plaintiffs' alleged antitrust injury is the pricing by Defendant and other allegedly Indian-law-noncompliant companies of VoIP services below the price set by World Phone for its services. The Court can only interpret these claims as predatory

---

[13] The deficiency of Plaintiffs' conspiracy claim is discussed in Section VIII, <u>infra</u>.

pricing claims. The Supreme Court has held that to state a claim for predatory pricing, a plaintiff must allege both that the defendant is pricing its goods below cost and that there is a dangerous probability that the defendant will recoup its investment in anticompetitive pricing once it has achieved monopoly power. Plaintiffs have alleged neither, and thus their claims under the Sherman Act must be dismissed.

## VI. APPLICATION OF THE FTAIA

Defendant also moves to dismiss the Complaint on the grounds that Plaintiffs' Sherman Act claims are foreclosed by the Foreign Trade Antitrust Improvements Act ("FTAIA"). The FTAIA provides, in relevant part, that:

> [The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
>      (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>      (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
> (2) such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section.
> If [the Sherman Act] appl[ies] to such conduct only because of the operation of paragraph (1)(B), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a. Parsing this text reveals that the FTAIA first limits the reach of the U.S. antitrust laws by articulating a general rule that the Sherman Act "shall not apply to conduct involving trade or commerce . . . with foreign nations." "The FTAIA then creates two distinct exceptions that restore the authority of the Sherman Act. First, the FTAIA provides that it does not apply (and thus that the Sherman Act <u>does</u> apply) if the defendants were involved in 'import trade or import commerce' (the 'import trade or commerce' exception). Second, the FTAIA's bar is

inapplicable if the defendants' 'conduct has a direct, substantial, and reasonably foreseeable effect' on domestic commerce, import commerce, or certain export commerce and that conduct 'gives rise' to a Sherman Act claim (the 'effects' exception)." Animal Sci. Prod., Inc. v. China Minmetals Corp., 654 F.3d 462, 466 (3d Cir. 2011). See generally Turicentro, 303 F.3d at 298–306 (discussing the FTAIA, the import trade or commerce exception, and the effects exceptions); Carpet Grp. Int'l v. Oriental Rug Imp. Ass'n., 227 F.3d 62, 71–73 (3d Cir. 2000) (discussing the FTAIA and the import trade or commerce exception).[14]

Defendants assume that the relevant market alleged by Plaintiffs involves commerce with foreign nations and argue that Plaintiffs' action is foreclosed under section (1)(A), namely that Defendant's alleged predatory pricing in India has not been alleged to have the requisite direct, substantial, and reasonably foreseeable effect upon domestic United States commerce. Plaintiffs respond that they have alleged the requisite effect, but also contend that the FTAIA does not apply to Plaintiffs' claims at all, because Plaintiffs' relevant market involves only import commerce. Neither Defendant's nor Plaintiffs' arguments are directly on point for the application of the FTAIA in this case, because both skip the first step in FTAIA analysis, which here proves dispositive. Before applying the "effects exception" or the "import commerce" exception, the Court must first determine whether Defendant's alleged anticompetitive conduct involved "trade or commerce with foreign nations."

Considering the relevant market identified by Plaintiffs and the other allegations of the Complaint taken as a whole, the Court finds that the conduct alleged in the Complaint involves

---

[14] As a threshold matter, the Third Circuit has held "that the FTAIA constitutes a substantive merits limitation rather than a jurisdictional limitation," so Defendant's challenge is appropriately brought, and the standard of Fed. R. Civ. P. 12(b)(6) applies. Animal Sci, 303 F.3d at 467-68.

both commerce within the United States and commerce with a foreign nation, India. The Complaint alleges:

> The relevant market for purposes of this claim derives from the business for non-mobile VoIP traffic originating or terminating between the United States and India.

[Complaint, ¶ 42]. Defendant Microsoft, a US corporation, is alleged to have charged predatory prices both to US customers seeking to call India from the United States and to Indian customers seeking to call the United States from India. These two categories of conduct must be considered separately, because they are treated differently under the FTAIA.

Under the first category of conduct — Defendant selling VoIP services to domestic, US customers — the FTAIA is not implicated, because the conduct does not involve foreign commerce. The FTAIA applies only to trade or commerce with foreign nations. 15 U.S.C. § 6a. Sales of services by a United States corporation to United States consumers in the United States are not sales in foreign commerce. Microsoft is a United States Company. Its headquarters, along with the infrastructure it uses to provide VoIP services to consumers in the United States, are located within the United States. When Microsoft sells VoIP services to United States consumers in the United States it is engaged in purely domestic commerce, even if those consumers are making calls over VoIP to India. The commercial act of Defendant Microsoft is the sale of services, and it is the Defendant's conduct which matters in considering questions under the FTAIA. Turicentro, S.A. v. Am. Airlines Inc., 303 F.3d 293, 303 (3d Cir. 2002) overruled on other grounds by Animal Sci., 654 F.3d 462, (Under the FTAIA, "[t]he relevant inquiry is [into] the conduct of the defendants."). Because these sales are purely domestic, the FTAIA does not apply, and a claim under the Sherman Act is possible. As will be explained in Section VII, infra, while possible, no Sherman Act claim in the domestic market has been alleged.

Under the second category of conduct — Defendant selling VoIP services to customers in India — the FTAIA is implicated. Defendant Microsoft, a United States Corporation, is alleged to have sold VoIP services to customers in India, a foreign country. Accordingly, these sales "involve" foreign commerce under the FTAIA. At this point, in briefing, Defendant moves on to consider the requirements of Section 1(A) of the FTAIA, while Plaintiffs seek to apply the import exception. However, it is clear to the Court that a different provision of the FTAIA applies, that governing export commerce. Section (1)(B) provides that the FTAIA does not bar actions under the Sherman Act where a direct, substantial, and reasonably foreseeable effect upon export commerce is alleged. Plaintiffs' pleadings meet this standard; Defendant, a United States corporation, is alleged to have sold services, utilizing infrastructure in the United States, to consumers in a foreign market (India). This is not, however, the end of the inquiry, because the final paragraph of the FTAIA provides that "[i]f [the Sherman Act] appl[ies] to such conduct only because of the operation of paragraph (1)(B), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States." 15 U.S.C. § 6a (emphasis added). The injury alleged in this case is to foreign competitors of a US exporter in a foreign market. This is precisely the circumstance that the final paragraph of the FTAIA is meant to exempt from the antitrust laws. See Turicentro, 303 F.3d at 298-99 ("Congress in 1982 enacted Title IV of the Export Trading Company Act — known as the Foreign Trade Antitrust Improvements Act — to facilitate domestic exports and to clarify the application of United States antitrust laws to foreign conduct. The Foreign Trade Antitrust Improvements Act encourages United States exports by facilitating the formation of export trading companies and by exempting certain export transactions from the antitrust laws. 15 U.S.C. § 4001(b)."); Id. (citing Carpet Group Int'l v. Oriental Rug Imps. Ass'n, 227 F.3d 62, 71 (3d Cir. 2000) ("[T]he [FTAIA]

demonstrated Congress's intent to exempt from the Sherman Act export transactions not injuring the United States economy, thereby relieving exporters from a competitive disadvantage in foreign trade.")); Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796 n. 23 (1993) ("The FTAIA was intended to exempt from the Sherman Act export transactions that did not injure the United States economy."). Accordingly, Microsoft cannot be sued under the Sherman Act by a foreign competitor, for conduct involving Microsoft's export of services to a foreign market, and allegedly giving rise to injury only to the foreign competitor in that foreign market. To the extent that Plaintiffs' antitrust claim is raised against Defendant as a US exporter of VoIP services to India, it is foreclosed by action of the FTAIA.

## VII. RELEVANT MARKET DEFINITION

There are two major flaws in Plaintiffs' definition of the relevant market. The first, as discussed, supra, arises because, as currently alleged, the relevant market in this case is the market for VoIP traffic "originating or terminating between the United States and India." [Complaint, ¶ 42 (emphasis added)]. As explained above, this is not a coherent single market because it involves two distinct forms of commerce, one domestic, one foreign, which are treated differently under the FTAIA. Claims concerning the foreign market are exempted from the coverage of the Sherman Act, because the Act, by the terms of the FTAIA, does not apply to the conduct of an American exporter in a foreign country that benefits rather than harms American exports. Therefore, any claim Plaintiff might bring under the Sherman Act would have to arise from Defendant's conduct in the domestic market. It does not appear that the Complaint alleges any injuries to Plaintiff World Phone from the VoIP business in the United States. [Complaint, ¶

29 (expenditure of $3 million in "wasted" advertising was "within India"); ¶¶ 30-31 (decline in market share/revenue attributed to Defendant's failure to comply with "civil and criminal laws promulgated in India.")]. In fact, it is unclear in the Complaint whether World Phone even truly operates in the United States. [Complaint, ¶ 5 (identifying "World Phone [as] one of the largest providers of [VoIP] services in India." No mention is made of a presence in the United States.)]. Accordingly both halves of Plaintiffs' relevant market are either excluded from the purview of the Sherman Act by operation of the FTAIA, or devoid of allegations of antitrust injury. In either case Plaintiffs' relevant market definition is deficient and requires dismissal.

This brings the Court to the second major flaw; Plaintiffs have not alleged the necessary facts to define the relevant market with reference to long-accepted antitrust metrics. Plaintiffs have the burden of defining the relevant market. Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 512 (3d Cir. 1994). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. U.S., 370 U.S. 294, 325 (1962). See also Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991) (same). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436-37 (3d Cir. 1997) (emphasis in original).

While Plaintiffs offer considerable argument in briefing as to how the relevant market has already been adequately alleged, and indeed present many new facts not contained within the

Complaint which they claim would bolster their proposed market definition, the Court is unable to identify any facts in the Complaint explaining what the possible substitutes or interchangeable products for VoIP services are, why the market for VoIP services should be subdivided into specific country-to-country connections instead of globally or regionally, why the relevant market should exclude mobile VoIP services, what Plaintiff World Phone's and Defendant's relative shares of the market in VoIP services are, or even what the size of the market for VoIP services is in India, in the United States, or globally. Without even bare bones assertions that VoIP internet telephony is not reasonably interchangeable with cellular telephony or the traditional PSTN, this Court cannot make a finding that Plaintiff has alleged a relevant market cognizable under the antitrust laws. Plaintiffs have alleged no facts concerning VoIP substitutes. Plaintiffs make reference to the Third Circuit's holding in <u>Queen City Pizza</u>, but provide no contrary precedent or convincing argument why its rule should not apply in this case. [Plaintiff's Brief in Opposition, p. 26 (seeking to distinguish <u>Queen Pizza</u> and related cases "the products and services implicated by this action are not roofing products or food commodities")]. Accordingly, Defendant's Motion to Dismiss Plaintiffs' Sherman Act claims for failure to allege a relevant market — a necessary element of such a claim — is granted. This is an independent and alternative basis for dismissal, the Court having already found neither TI nor World Phone has standing to sue under the antitrust laws.


VIII. SECTION 1 CONSPIRACY


Although the Court has already determined that Plaintiffs have insufficiently alleged the relevant market for all federal claims in the Complaint, I now consider Plaintiffs' conspiracy

claim separately because it is independently defective. The entire basis of Plaintiffs' Section 1 conspiracy, as currently alleged, is that Microsoft and other unnamed competitors of Plaintiff engaged in a course of unlawful, anticompetitive "parallel conduct" by 1) intentionally failing to comply with Indian regulatory statutes, and 2) charging artificially low prices to drive Indian-law-compliant competitors from the marketplace. [Complaint, ¶ 50]. The Court describes the conduct as "parallel," because Defendant and the other noncompliant competitors are alleged to have engaged in the same type of conduct, at the same time, in the same market. What is missing from these allegations is some suggestion that Microsoft and the other noncompliant competitors agreed to engage in the course of conduct or otherwise coordinated their efforts. "[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, that conduct must be placed in 'some setting suggesting the agreement necessary to make out a § 1 claim.' In other words, the complaint must allege some 'further circumstance,' 'something more than merely parallel behavior,' 'pointing toward a meeting of the minds.' If, in the circumstances alleged, the asserted 'parallel conduct ... could just as well be independent action,' then the complaint has failed to plead a § 1 claim." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 361-62 (3d Cir. 2010) (quoting Twombly, 550 U.S. at 557, 560). From the factual circumstances alleged in the Complaint, the Court can only conclude that Microsoft was not the only VoIP service provider allegedly failing to comply with Indian law. Since Plaintiffs allege that complying with Indian law is expensive, it is not a leap of logic to infer that Microsoft and the other competitors each have an independent business motive not to obey the Indian regulations. Likewise, once cost savings have been realized by failing to comply, the competitors also would have independent business motives for charging lower prices, namely to attract more customers and earn more revenue. Other than the bald conclusion by Plaintiff that Microsoft conspired with other

noncompliant competitors, there are no facts in the Complaint to suggest such a conspiracy, or

that the behavior of the noncompliant competitors was anything more than independent action.[15]

Accordingly, Plaintiffs' Section 1 conspiracy claim must be dismissed on this basis as well.


IX. SUPPLEMENTAL JURISDICTION


"A district court can decline to exercise supplemental jurisdiction in several

circumstances, including a situation where 'the district court has dismissed all claims over which

it has original jurisdiction,' as in this case." Trinity Indus., Inc. v. Chicago Bridge & Iron Co.,

735 F.3d 131, 135 (3d Cir. 2013) (quoting 28 U.S.C. § 1367(c) (3)). With all of the federal

claims in this case having been dismissed, the Court declines to exercise its supplemental

jurisdiction over Plaintiffs' state law claims. Counts II, III, and IV are accordingly dismissed

without prejudice.


CONCLUSION


For the foregoing reasons this Court finds i) that Plaintiff TI Investment Services lacks

standing to bring suit in this case; ii) that Plaintiff World Phone has inadequately alleged an

antitrust injury and, thus, lacks standing to sue under the Sherman Act; iii) that the FTAIA

---

[15] In fact, the allegations in the Complaint, other than the mere assertion that a conspiracy exists, seem to indicate the Plaintiff is specifically alleging only parallel conduct. See Complaint, ¶ 50 ("Although there are other firms competing in the Relevant Market who have tacitly conspired with Defendant to also not comply with Indian law, the injury sustained by the competitive process is greatest as a result of Defendant Microsoft's conduct because of its attempted monopolistic position within the Relevant Market. Defendant Microsoft's 'stamp of approval' regarding non-compliance with Indian regulatory law has likely emboldened other smaller players to continue with their violations.").

exempts certain of the Defendant's conduct from the applicability of the Sherman Act; iv) that Plaintiff World Phone has inadequately alleged the relevant market for its antitrust claims; v) that Plaintiff World Phone has inadequately alleged the elements of a Sherman Act conspiracy; and vi) in the absence of federal claims the Court declines to exercise its supplemental jurisdiction over claims brought under New Jersey state law. Accordingly, the Complaint is dismissed.

It is important to note that the dismissal of the Complaint in this case does not leave Plaintiffs without remedy. A common thread running through all of the deficiencies of the Complaint is that Plaintiffs have tried, unsuccessfully, to recast the alleged violation of Indian regulatory statutes as violations of United States antitrust law. The Courts of India are better positioned to determine whether their own national laws have been violated, and, if so, what the antitrust consequences, if any, are in their national market. If Plaintiffs wish to renew their suit, they should do so in the jurisdiction where they are alleged to have competed with Defendant, to have complied with regulatory laws, and to have suffered injury, and that is India.

Order to follow.

Dated: ____5/30/2014_____                          _____/s/ Freda L. Wolfson_____
                                                     The Honorable Freda L. Wolfson
                                                     United States District Judge